# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JAMES ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0552-LM |
| | ) | |
| KENNETH ROBINSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MAGISTRATE'S POST-TRIAL FINAL REPORT

Final Report: August 15, 2024
Date Submitted: March 28, 2024

William B. Larson, Jr. and John J. Klusman, III, MANNING GROSS + MASSENBURG LLP, Wilmington DE; *Counsel for Plaintiff.*

Brian J. Ferry, FERRY JOSEPH, P.A., Wilmington, DE; *Counsel for Defendant.*

**MITCHELL, M.**

## I. INTRODUCTION

Although this case deals with a potential contract dispute, at its heart is a family relationship that has deteriorated. The parties don't have a traditional family relationship in that they were born into the same family. Rather, at one point they were a family because they chose to be a family and endeavored to create such a relationship for themselves.

Kim Anderson, not a party to this case, is the link between the parties. Kim Anderson met the Defendant, Kenneth Robinson, when she was a teenager and friends with the Defendant's daughter. Through the years the relationship between Kim Anderson and the Defendant and his wife, Eileen Robinson, grew into a parent and child relationship. She treated the Defendant and his wife as her parents and referred to them as her mom and dad. For a time, the Robinsons treated Kim Anderson similar to their biological children.

Currently, Kim Anderson lives with her partner, the Plaintiff James Anderson and their two children. Plaintiff met the Defendant through Kim Anderson. Plaintiff filed this lawsuit to enforce an alleged promise between the parties. Plaintiff's Complaint alleges that he and Defendant Kenneth Robinson, came to an agreement that Defendant would move into the basement of his home. The basement required remodeling due to Defendant's wife's medical needs and Plaintiff alleges that the parties mutually agreed that Defendant would reimburse him for those expenses.

Defendant denies Plaintiff's claim and asserts, arguendo, that Plaintiff could not have reasonably relied on any alleged promise to repay for the renovations because he was aware the Defendant was having financial trouble. Moreover, Defendant asserts that Plaintiff has only benefited from these renovations. At the heart of the issue is whether an actual agreement or promise occurred, and whether Plaintiff reasonably relied on it. For the reasons explained below, I find that the Plaintiff failed to prove that the parties entered into an enforceable agreement and Defendant made any promise to repay him for the construction. Accordingly, I find that the Plaintiff did not reasonably rely on a promise, and the enforcement of the alleged promise is not necessary to avoid injustice.

## II.    BACKGROUND[1]

Plaintiff James Anderson (hereinafter, the "Plaintiff") owns the property located at 12 Barberry Lane, Wilmington, DE, 19807 (the "Property").[2] Kim Anderson alleges Kenneth Robinson (the "Defendant") had a parent-like relationship with her for twenty-five years before their relationship deteriorated in the summer of 2022.[3] Although Ms. Anderson and the Robinsons live about 90

---

[1] The facts in this report reflect my findings based on the record developed at trial on February 9, 2024. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. __ " and citations to the Docket in the form of "D. I.__" for the Docket Item number.

[2] Pretrial Stip at 1.

[3] D. I. 7 at ¶2.

minutes from one another, they spent time together once or twice a month, spent holidays together, and spoke daily.[4] Plaintiff and Defendant were friends for a five-year period after initially meeting seven years ago.[5] Neither Plaintiff nor Defendant have ever loaned significant amounts of money to the other.[6]

In March 2020, Defendant's wife, Eileen Robinson ("Mrs. Robinson") was admitted to the hospital for a few days, so Mr. Robinson stayed with the Plaintiff and Kim Anderson (together "the Andersons").[7] During this visit, Defendant testified that Plaintiff brought him to the basement of the Property to "show [him] what he was thinking."[8] Defendant asserts that Plaintiff generally wanted to make a wheelchair-accessible apartment in the basement for Defendant and Mrs. Robinson (the "Robinsons") to live in.[9] Plaintiff contends that during this conversation, the parties came to a "handshake agreement" that if Plaintiff remodeled the basement, then Defendant would pay for the remodeling.[10] Defendant denies that he ever came

---

[4] Tr. 13:14-24; 14:1-24.

[5] Tr. 76:9-13; 127:5-8.

[6] Tr. 127:10-13.

[7] Tr. 15:1-2. Hospital visitation across the country was either prohibited or limited during this time because of COVID-19 restrictions.

[8] Tr. 213:17-23.

[9] Tr. 213:3-9.

[10] Tr. 84:15-23.

to the home with the purpose of looking at the basement.[11] Defendant also denies and Plaintiff agrees, that no conversation with the Andersons ever occurred regarding specific payment for basement remodeling or promises related to the costs of remodeling.[12] Further, Defendant testified that even if he had promised Plaintiff that he would repay him for remodeling expenses, he would have been unable to pay the renovation expenses.[13] Nonetheless, Defendant also testified that he recently sold his home and received $158,000 in proceeds from the sale.[14]

### A. Property Renovations

Two years after this purported agreement, Plaintiff entered into a contract (the "Contract") with Zane's Custom Carpentry for $90,070.02 worth of renovations to create the "in-law suite". [15] Plaintiff attributes supply chain issues and COVID for the two-year delay in starting the project.[16] Plaintiff claims that he relied on Defendant's promise and spent a considerable amount on renovations because of his familial-like relationship with Defendant and because "a deal is a deal."[17] Plaintiff further states that the "minutia of the details" related to the costs and construction

---

[11] Tr. 211:23-24.

[12] Tr. 214: 12-24; Tr. 215:1-7.

[13] Tr. 215:8-22.

[14] Tr. 245:1-6.

[15] D. I. 2 (Exhibit A).

[16] Tr. 7:14-22.

[17] Tr. 124:8-24.

4

were never discussed between the parties because Defendant trusted him to get the job done as they agreed.[18]

Renovations officially began in May 2022.[19] $28,000 became due in May 2022 as an initial deposit with additional payments due upon the completion of various tasks.[20] At trial, Plaintiff admitted that fifteen of sixteen payments made for the renovations were made regardless of the Robinsons' plan to move into the Property.[21] Plaintiff even used money from his retirement savings to pay for the renovations because he felt that he had a contractual obligation to pay the Contract regardless of his dealings with the Defendant.[22]

Defendant testified that he was unaware of the Contract or any basement renovation work being done at the Property until he was served with this lawsuit in May 2023.[23] When the Andersons decided to renovate the basement, one of their stated goals was to make it compliant with the American Disability Act ("ADA") standards for accessibility to fit Mrs. Robinson's needs.[24] However, Ms. Anderson

---

[18] Tr. 125:1-13.

[19] D. I. 7 at ¶10.

[20] D. I. 2 (Exhibit A).

[21] Tr. 173:7-11; D. I. 2 (Exhibit A).

[22] Tr. 173:9-11.

[23] Tr. 213:12-14; D. I. 1; Plaintiff never spoke to Defendant again about renovations after March of 2020.

[24] Tr. 66:14-16.

admitted that the finished bathroom was not designed for Mrs. Robinson's specific needs because after the parties' fallout, "it was really clear that at that point my parents [the Robinsons] weren't moving in."[25] Additionally, the placement of the bed in the bedroom is not currently tailored to allow Mrs. Robinson to navigate the room in her wheelchair.[26]

Moreover, Plaintiff alleges that he has suffered roughly $90,000 in losses for his liability under the Contract.[27] Plaintiff stipulated that these renovations are not an investment in the Property with a potential return because he personally does not expect to receive proceeds from the sale of the home because he has no intention to sell the home during his lifetime.[28] However, Plaintiff did testify that he trusted Mr. Robinson at his word and that the risk of not collecting from him was not considered when initially entering the Contract.[29] Plaintiff also stated that in the fall of 2022, it

---

[25] Tr. 67:4-9.

[26] Tr. 68:20-24.

[27] D. I. 7 at ¶33; Tr. 177:12-15; In the complaint, Plaintiff states that Defendant should be liable for $90,000. At trial, Plaintiff stated that he lost $116,000. The variance between these two numbers is the unexpected costs related to a gas leak and negligent air duct and ceiling installations incurred during the renovations. Plaintiff is not seeking to hold Defendant liable for these costs.

[28] Tr. 179:2-11.

[29] Tr. 160:11-20.

became understood that the Robinsons would not be moving in or paying for the renovations.[30]

## B.    Fallout Between the Parties

Sometime in June 2022, the relationship between Ms. Anderson and the Robinsons began to deteriorate.[31]   It began with the Robinsons uninviting the Andersons to stay at their home in New Jersey at the request of their daughter Lori, who planned to stay at their parents' home that same weekend.[32] Sometime later, the Andersons were also uninvited to attend the Defendant's birthday party in September of 2022.[33]  Ms. Anderson was also removed from the Robinsons' wills and asked her to remove her name form their deed to their New Jersey home.[34] An attempt to reconcile, made in October of 2022, was unsuccessful.[35] Ms. Anderson indicated she realized that the Robinsons were not going to move into the basement after she received an email, later in 2022, from the Robinsons asking her to remove her kids' things out of their house.[36]  Despite the change in their relationship, Ms.

---

[30] Tr. 159:3-17.

[31]  Tr. 20:1-3.

[32]  Tr. 20:8-24 – 21:1-6.

[33]  Tr. 59:15-19.

[34]  Tr. 59:20-22; Tr. 60:12-24.

[35]  Tr. 60:20-24.

[36]  Tr. 62:7-13: 63:7-14.

Anderson testified that the renovations continued with the hope that they would reconcile in the future.[37]

### C.     Procedural Background

Plaintiff filed an initial complaint on May 22, 2023, claiming negligent misrepresentation, promissory estoppel, and equitable fraud.[38] Defendant answered on August 3, 2023, claiming that Plaintiff ordered these repairs on his own volition, he did not promise to pay for renovations, and that no special relationship ever existed between the parties.[39] On August 30, 2023, Defendant moved for a protective order alleging Plaintiff's deposition request presented an undue burden.[40]

On September 5, 2023, I granted the Defendant's Motion for Protective Order and canceled the scheduled deposition.[41] I scheduled a pretrial conference for February 2, 2024, and the trial for one week following that conference.[42] At the conclusion of a day-long hearing on the merits, I ordered the parties to submit post-

---

[37] Tr. 61:1-8.

[38] D. I. 1; D. I. 3; D. I. 7; Complaint was amended to correct the Defendant's home address. The verified amended complaint was filed on May 25, 2023.

[39] D. I. 9.

[40] D. I. 12.

[41] D. I. 15.

[42] D. I. 29; D. I. 30.

trial summations three weeks from the date that the hearing transcript became available.[43] The parties submitted timely post-trial summations on March 28, 2024.[44]

## III. ANALYSIS

### A. Negligent Misrepresentation

To succeed on a claim for negligent misrepresentation, the Plaintiff must plead that: "(1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information."[45] To satisfy these requirements, the "plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly."[46]

Further, under Delaware law, a negligent misrepresentation claim is successful only "if there is either: (i) a special relationship between the parties over which equity takes jurisdiction (like a fiduciary relationship) or (ii) justification for

---

[43] D. I. 32.

[44] D. I. 33; D. I. 34.

[45] *CFGI, LLC v. Common C Holding LP*, 2024 WL 325567, at *11 (Del. Super. Ct. Jan. 29, 2024) (quoting *Vichi v. Koninklijke Philips Elecs.*, N.V., 85 A.3d 725, 822 (Del. Ch. 2014).

[46] *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *13 (Del. Ch. Apr. 30, 2018) (citations omitted).

a remedy that only equity can afford. The Court of Chancery has exclusive jurisdiction over claims of negligent misrepresentation."[47]

The particular relationships for negligent misrepresentation claims are relationships more akin to fiduciary or trustee relationships.[48] "Generally, [a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another."[49] For example, executors and agents are fiduciaries.[50]

However, there can be times where "a relationship predicated on particular confidence or reliance may give rise to fiduciary obligations."[51] Courts will consider "whether circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed" to determine whether such a relationship exists.[52] There

---

[47] *CFGI, LLC*, 2024 WL 325567, at *11. *See also, Biegler v. Underwriting Serv. Mgmt. Co.*, 2022 WL 17820533, at *3 (Del. Ch. Dec. 20, 2022) (citations omitted) (holding Negligent misrepresentation requires the existence of a special relationship "such as that between a director and stockholder or a trustee and *cestui que trust… .) "cestui que trust"* refers to the relationship between the beneficiary of a trust's equitable interest and the Trustee's legal title.

[48] *See id*.

[49] *Ballantine v. Latham*, 2022 WL 15627212, at *6 (Del. Ch. Oct. 28, 2022) (citing *Mitchell v. Reynolds*, 2009 WL 132881, at *9 (Del. Ch. Jan. 6, 2009) (internal quotation marks omitted)).

[50] *See Id.*

[51] *Id.*

[52] *Id.*

needs to be special trust imposed or any special duty to protect the plaintiff's interests.[53] The plaintiff must demonstrate its dependence on the defendant.[54]

Here, I find that Plaintiff failed to make an adequate claim of negligent misrepresentation because Plaintiff failed to show that he had a fiduciary or special relationship with Defendant such that Defendant owed him any duty. Further, even if Plaintiff believes a parent-like relationship would satisfy the requirement, Plaintiff fails to establish that this parent-like relationship placed him in a position of weakness against Defendant or that the Defendant owed him any duties. Evident here, the parties were on equal terms.

## B. Equitable Fraud

"A claim for negligent misrepresentation is often referred to interchangeably as equitable fraud."[55] However, a claim of equitable fraud can only be adjudicated in a court of equity.[56] To state a claim for equitable fraud, the Plaintiff must prove by a preponderance of the evidence: (1) the parties were in a fiduciary or confidential relationship, (2) the defendant made a false representation, (3) the defendant

---

[53] *See Blueacorn PPP, LLC v. Pay Nerd LLC*, 2024 WL 481053, at *2 (Del. Ch. Jan. 29, 2024).

[54] *See Id.* at *3.

[55] *Fortis Advisors, LLC v. Dialog Semiconductor,* 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015).

[56] *See Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *6 (Del. Ch. Apr. 30, 2014).

intended to induce action by that false representation, (4) there was reasonable reliance on that false representation, and (5) the plaintiff suffered causally related damages.[57]

Like negligent misrepresentation, to satisfy the special relationship requirement for equitable fraud, the relationship must be fiduciary or trustee-like.[58] That duty cannot be substituted for the duty to cooperate in a contract as the Court "does not apply fiduciary duty doctrine to ordinary commercial transactions" which are normally regulated by normal market conditions as opposed to "concerns of equity for persons in special relationships of trust and confidence." [59]

Plaintiff's claim for equitable fraud also fails due to the lack of special relationship between the parties. As stated above, regardless of whether there was a parent-like relationship, it's insufficient to satisfy the special relationship requirement for equitable fraud. Moreover, Plaintiff's assertion that the parties had an oral contract and Defendant failed to pay for the basement renovations in compliance with their alleged oral contract, is not an appropriate basis for relief under equitable fraud because the duty to cooperate in a contract is merely a

---

[57] *Anderson v. Hill*, 2024 WL 64774, at *6 (Del. Ch. Jan. 5, 2024).

[58] *Biegler*, 2022 WL 17820533, at *3.

[59] *Blueacorn PPP, LLC*, 310 A.3d at 594.

12

contractual duty rather than one that requires specialized trust akin to a fiduciary duty.

Further, Plaintiff has also failed to show that Defendant made a false representation or that he intended to induce Plaintiff to renovate the basement. I find it credible that Defendant indicated some desire to move into Plaintiff's basement. However, Defendant was not involved in any of the contractor negotiations. When Plaintiff executed the contract with the contractor and determined costs, Plaintiff admits that he did not inform Defendant before he did so even though a two year period passed since the initial discussion. Defendant's role in the specifics of the design of the renovations were also limited. Except for limited information regarding the Robinson's disability needs, Defendant was not in control of the design of the renovations nor was he aware of the status of the basement project and its progression like one would expect a financier to be aware of.

Plaintiff also failed to show reasonable reliance. Plaintiff produced no evidence of any significant discussions with Defendant about the material facts of the construction. Very little related to needs, timing, cost, or repayment. As such, Plaintiff had no basis to believe that Defendant had the financial capability or intention of paying over $90,000 for the basement project. Plaintiff was aware that Defendant had to sell his house to cure medical costs. That fact alone was cause for a formal agreement regarding repayment of nearly $100,000.

13

To the extent the July 2022 fall out between the parties evinces some intention for Defendant to move into Plaintiff's basement, following the fall out it became unequivocally clear that Defendant was no longer going to do so while Plaintiff continued to make modifications and progress on the project.

## C. Promissory Estoppel

To state a claim for promissory estoppel, "a plaintiff must prove by clear and convincing evidence that: '(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.'"[60]

"Promissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectations of parties rendered vulnerable by the very processing of attempting to form commercial relationships."[61] "Promissory estoppel requires a real promise, not just mere expressions of expectation, opinion, or assumption. Such a promise must be reasonably definite and certain."[62]

---

[60] *Kokorich v. Momentus Inc.*, 2023 WL 3454190, at *11 (Del. Ch. May 15, 2023) (quoting *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020).

[61] *Schaeffer v. Lockwood*, 2021 WL 5579050, at *18 (Del. Ch. Nov. 30, 2021).

[62] *Id.*

### 1. Defendant did not promise to pay for the basement renovations.

Plaintiff failed to establish a claim for promissory estoppel. It is unclear whether Defendant promised to pay for the renovations. It is clear, however, that Defendant did not promise to pay for a specified amount, a detail that I find material for a residential renovation totaling almost $100,000. Plaintiff contends that Defendant promised to pay for the basement renovations while Defendant denied ever making such a promise. Plaintiff provided no proof to show that Defendant made a promise other than his testimony. I don't find Plaintiff's testimony alone, enough to show that Defendant made a real, reasonable, and definite promise. At best, it was a mere "expression of expectation, opinion, or assumption."[63]

### 2. Defendant did not reasonably expect to induce Plaintiff to renovate his basement based on an alleged promise.

Defendant did not have a reasonable expectation to induce Plaintiff to incur the costs of the basement renovations. The parties were friends for five years through their mutual relationship with Ms. Anderson. During that time they never loaned money to each other or executed any form of transaction with one another whatsoever. Plaintiff had no basis to have a reasonable belief that Defendant had $100,000 at the time of the alleged oral agreement.

---

[63] *Id.*

### 3. Plaintiff did not reasonably rely on Defendant's alleged promise.

Even if Defendant did allegedly promise to pay for the basement renovations, Plaintiff did not reasonably rely on such a promise. Defendant never saw the contract from the contractor. He never saw the status of the project. Plaintiff never informed Defendant about the contract and never sent him any updates on it, even after their falling out. At most, Plaintiff alleged that the parties had an oral agreement that the renovation costs would amount to around $100,000, but never settled on a specific amount, even after Plaintiff signed the contract with the contractor and determined the prices. Also, Plaintiff admitted that he assumed a risk of not getting reimbursed.

Furthermore, the basement renovations were not being constructed to meet the Defendant's needs. The bedroom would not fit Eileen Robinson's wheelchair. Plaintiff confirmed that, after the Defendant told him that he was not moving in, that Plaintiff decided to make changes to the basement project. Plaintiff specifically discussed how they modified their project to no longer meet the needs of Defendant's. Plaintiff issued sixteen checks to Zane to pay for the basement renovations. Fifteen of them were issued after the falling out between the families, where it became more clear that the Defendant no longer wished to move into the Plaintiff's basement. Plaintiff confirmed that only one of his sixteen payments was made prior to Defendant informing him that he would not pay. Plaintiff never spoke to Defendant again about the basement renovation after March 28, 2020.

16

Plaintiff admitted that he assumed the risk that the Defendant would not reimburse him for the basement. Plaintiff also admitted that he was assuming a risk by moving forward with the project after knowing the Defendant would not pay. Plaintiff knew that Defendant was not going to move into the basement by the fall of 2022 when Defendant told Plaintiff to remove all his property in the house. Yet, Plaintiff continued to make payments for the renovations with this knowledge.

**4.     Enforcement of Defendant's alleged promise is not necessary to avoid injustice.**

Defendant's alleged promise does not need to be enforced to avoid any injustice to Plaintiff. Plaintiff admitted that when he goes to sell his house, that it will sell for a higher dollar amount because of the basement renovation. Plaintiff confirmed that many of the jobs completed by contractors on his house were not related to Defendant and not requested by Defendant. Plaintiff claimed that the contractors that he hired were negligent. There was a gas leak, air ducts were installed incorrectly, a ceiling had to be installed, and more. Defendant should not be responsible for the increased costs that resulted from the negligence of Plaintiff's contractors. Nor should Defendant be required to pay for basement renovation costs when Plaintiff knew Defendant was not going to move into the basement.

17

## IV.    CONCLUSION

For reasons further explained above, I find Plaintiff has failed to establish claims for negligent misrepresentation, equitable fraud, and promissory estoppel. The parties' parent-like relationship, to the extent it fully existed, does not arise to any form of fiduciary relationship. Plaintiff blatantly continued to make payments on the basement project after he knew Defendant was not going to move into the basement. Defendant will not be liable for costs on such grounds.

This is my Final Report, and exceptions may be filed under Court of Chancery Rule 144.